Gloria L. KOLTON, Respondent,

v.

COUNTY OF ANOKA, Defendant and Third–Party Plaintiff, Petitioner, Appellant,

v.

Allan T. Roth, individually and d/b/a A.T. Group, Petitioner, Appellant,

Sun Life Assurance Company of Canada, Petitioner, Appellant.

No. C1–00–2179.

Supreme Court of Minnesota.

June 13, 2002.

Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Asst. Anoka County Attorney, Anoka, MN, for Appellant, County of Anoka.

Frederick E. Finch, Charles E. Lundberg, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, MN, for Appellant, Allan T. Roth.

James F. Roegge, Meagher & Geer, P.L.L.P., Minneapolis, MN, Mark E. Schmidtke, Hoeppner, Wagner & Evans, L.L.P., Valparaiso, IN, for Appellant, Sun Life Assurance Company of Canada.

Wayne J. Rice, The Law Office of Wayne J. Rice, P.A., Minneapolis, MN, for Respondent.

Mike Hatch, Attorney General, Erica Jacobson, Asst. Attorney General, St. Paul, MN, for amicus curiae State of Minnesota.

Roderick J. Macpherson III, Minnesota Disability Law Center, Minneapolis, MN, for amici curiae Mental Health Association of Minnesota, Mental Health Consumer/Survivor Network, National Alliance for the Mentally Ill–Minnesota and Minnesota Disability Law Center.

Carolyn Doppelt Gray, Michael B. Lehrhoff, Epstein Becker & Green, P.C., Washington, DC, for amicus curiae American Council of Life Insurers.

## OPINION

LANCASTER, Justice.

█ We are asked to decide whether an employer that provides at no cost to its employees a long-term disability plan that limits benefits for disability due to mental illness to 24 months unless the employee is confined to a hospital or an institution licensed to provide psychiatric treatment, but does not so limit benefits for physical disabilities, discriminates because of disability in violation of the Minnesota Human Rights Act (MHRA), Minn.Stat. § 363.03, subd. 1(2)(c) (2000), or violates the right to equal protection under the Minnesota and United States Constitutions. We conclude that such an employer does not discriminate because of disability in violation of the MHRA and does not violate the right to equal protection under the Minnesota and United States Constitutions.

The parties agree that the material facts are not in dispute. In 1987, appellant County of Anoka added long-term disability (LTD) insurance to its employee benefits package. In 1994, the county solicited bids for LTD coverage and received proposals from nine companies. The proposals contained a distinction, standard in the industry, in benefits between mental and physical disabilities. The proposals limited benefits for disability due to mental illness to 24 months unless the employee was confined to a hospital or an institution licensed to provide psychiatric treatment, but did not contain a similar limitation on benefits for physical disabilities. Appellant Sun Life Assurance Company of Canada submitted the least expensive proposals and the county accepted one of them. The Sun Life policy selected by the county took effect on July 1, 1994. The county provided the policy to its employees, without regard to their physical or mental status, at no cost to them.

Respondent Gloria Kolton worked for Anoka County as an income maintenance specialist from December 1990 to October 1994. She resigned due to mental illness and has been disabled ever since. She received long-term disability benefits from Sun Life from April 1995 to April 1997.

At the end of that 2–year period, Sun Life terminated her benefits because she was not confined to a hospital or an institution licensed to provide psychiatric treatment.

In early 1997, Kolton filed a charge of disability discrimination against Anoka County with the Equal Employment Opportunity Commission (EEOC). Later that year, the EEOC issued a determination that the county had violated Title I of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12112 (1994). After the EEOC determination, the county obtained additional LTD coverage that removed the limitation on benefits for disabilities due to mental illness, for which it paid an additional $28,000 in annual premiums.

Kolton filed suit against the county, alleging that it had violated the Equal Protection Clause, U.S. Const. amend. XIV, § 1, the right to equal protection under the Minnesota Constitution, Minn. Const. art. 1, § 2, the MHRA, Minn.Stat. § 363.03, subd. 1(2) (2000), and the ADA, 42 U.S.C. § 12112. The county filed a third-party complaint against Allan T. Roth,[1] individually and doing business as A.T. Group, and Sun Life. Anoka County, Sun Life, and Roth (collectively, appellants) then moved to dismiss Kolton's complaint or, in the alternative, for summary judgment.

The district court granted appellants' motion for summary judgment and dismissed all of Kolton's claims. First, the district court applied rational basis review to Kolton's federal and state equal protection claims and found that the limitation on benefits for disability due to mental illness served the county's legitimate purpose of considering cost and economic factors

when selecting its insurance policies. Next, the district court held that Kolton did not have standing to maintain her ADA claim. Finally, the district court concluded that the MHRA does not prohibit an employer from granting different benefits for different disabilities in LTD plans.

Kolton appealed[2] and the court of appeals affirmed in part and reversed in part. *Kolton v. County of Anoka,* 628 N.W.2d 643, 645 (Minn.App.2001). With respect to the MHRA claim, the court of appeals reversed and entered summary judgment in Kolton's favor. The court of appeals held that "differences in long-term disability benefits based merely on whether an employee is physically or mentally disabled is discrimination in violation of the MHRA." *Kolton,* 628 N.W.2d at 648. As to the constitutional claims, the court of appeals acknowledged that limiting benefits for disabilities due to mental illness may decrease the cost of disability insurance, and therefore affirmed summary judgment in appellants' favor. *Id.* at 649.

Appellants petitioned for further review of the MHRA claim. Kolton requested cross-review on the constitutional claims, and we granted the parties' requests for further review. With respect to the MHRA claim, we reverse and reinstate summary judgment in favor of appellants. As to the constitutional claims, we affirm summary judgment in favor of appellants.

On appeal from summary judgment where there are no genuine issues of material fact, we review whether the district court erred in its application of the law. *Associated Builders & Contractors v. Ventura,* 610 N.W.2d 293, 298 (Minn.2000); *Metro. Prop. & Cas. Ins. Co. v. Metro. Transit Comm'n,* 538 N.W.2d 692, 695

---

**1.** Roth submitted a proposal on behalf of Sun Life to Anoka County in response to the county's request for bids for LTD coverage.

**2.** Kolton did not appeal the summary judgment on her ADA claim.

(Minn.1995). That question, whether the district court erred in its application of the law, is subject to de novo review. *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998); *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn.1997). In this case, the legal questions involve both statutory and constitutional questions.

### Minnesota Human Rights Act Claim

■■■ We first address whether Anoka County discriminated against Kolton because of her disability in violation of Minn. Stat. § 363.03, subd. 1(2)(c). Statutory interpretation is a question of law subject to de novo review. *Hince v. O'Keefe*, 632 N.W.2d 577, 582 (Minn.2001); *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 190 (Minn.1990). When we interpret a statute, our goal "is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2000); *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001). We will not disregard the words of a statute if they are free from ambiguity. Minn.Stat. § 645.16; *State v. Gorman*, 546 N.W.2d 5, 8 (Minn.1996).

Kolton asserts that the county violated Minn.Stat. § 363.03, subd. 1(2)(c), which states, "Except when based on a bona fide occupational qualification, it is an unfair employment practice [f]or an employer, because of * * * disability * * * to discriminate against a person with respect to * * * compensation, terms, * * * or privileges of employment." The MHRA's definition of "discriminate" includes "segregate or separate." Minn.Stat. § 363.01, subd. 14 (2000). The distinction between mental and physical disabilities in the county's LTD plan arguably constitutes a "separation" because it sets apart employees who become mentally disabled from those who become physically disabled. On the other hand, the county may not

have discriminated on the basis of disability because it provided the same plan·on the same terms to its employees. Thus, the language of the statute does not unambiguously answer the question whether providing—to all employees equally—a disability policy that contains different coverage for different kinds of disabilities amounts to discrimination "because of" disability.

In the past, we have found interpretations of federal anti-discrimination statutes useful to guide our interpretation of the MHRA when the MHRA provisions in question are similar to provisions of the federal statutes. *See State by Cooper v. Hennepin County*, 441 N.W.2d 106, 110 (Minn.1989) (relying on interpretations of the Rehabilitation Act of 1973 in construing the definition of "disabled person" under the MHRA); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719 (Minn.1986) (acknowledging application of interpretations of Title VII of Civil Rights Act of 1964 to interpret MHRA because of similarities between the statutes). When provisions of the MHRA are not similar to provisions of federal anti-discrimination statutes, however, we have departed from the federal rule in our interpretation of the MHRA. *See Cummings v. Koehnen*, 568 N.W.2d 418, 422 n. 5 (Minn.1997) (acknowledging departure from federal rule because of textual differences between the MHRA and federal statute).

Appellants argue that the section of the MHRA at issue in this case, Minn.Stat. § 363.03, subd. 1(2)(c), has a comparable counterpart in Title I of the ADA. They ask us to interpret the MHRA in accord with federal appellate courts' interpretations of Title I. Kolton asserts that the federal courts' interpretations of Title I do not bind this court's interpretation of the MHRA and argues that we have rejected

the rationale underlying their interpretations of Title I.

Appellants call our attention to the following language of Title I of the ADA: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to * * * employee compensation, * * * and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1994). Although section 363.03 and section 12112 are not identical, they both prohibit employment discrimination based on disability. We conclude that the state and federal provisions are sufficiently similar that we should be guided by interpretations of Title I in analyzing Kolton's MHRA claim.

The federal courts are essentially unanimous in rejecting the argument that Title I prohibits distinctions between mental and physical disabilities in coverage for long-term disability benefits. *See EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148–50 (2d Cir.2000); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1116–18 (9th Cir.2000); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1101–02 (10th Cir. 1999); *Lewis v. Kmart Corp.*, 180 F.3d 166, 170 (4th Cir.1999); *Ford v. Schering–Plough Corp.*, 145 F.3d 601, 608 (3d Cir. 1998); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1015–16 (6th Cir.1997); *EEOC v. CNA Ins. Cos.*, 96 F.3d 1039, 1044 (7th Cir.1996).[3]

Many of the federal appellate courts hold specifically that no discrimination occurs for purposes of Title I of the ADA if all employees enjoy equal access to a LTD plan, even if the policy provides different coverage for mental and physical disabilities. The reasoning of the Seventh Circuit is typical:

All employees—the perfectly healthy, the physically disabled, and the mentally disabled—had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two·years if the problem was mental or nervous. This may or may not be an enlightened way to do things, but it was not discriminatory in the usual sense of the term.

*CNA Ins. Cos.*, 96 F.3d at 1044; *see Weyer*, 198 F.3d at 1116 ("[T]here is no discrimination under the [ADA] where disabled individuals are given the same opportunity as everyone else, so insurance distinctions that apply equally to all employees cannot be discriminatory."); *Lewis*, 180 F.3d at 170 (holding that Title I of the ADA "does not require a long-term disability plan that is sponsored by a private employer to provide the same level of benefits for mental and physical disabilities"); *Ford*, 145 F.3d at 608 ("So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities."); *Parker*, 121 F.3d at 1015 ("The disparity in benefits provided in the policy at issue is also not prohibited by the ADA because the ADA does not mandate equality between individuals with different disabilities.").

Kolton contends that we rejected the rationale underlying these decisions—that an employer does not discriminate because of disability if employees have equal access to the same LTD plan even if the plan distinguishes between mental and physical disabilities—in *Minnesota Mining and*

---

**3.** One Eleventh Circuit panel departed from the rule established by the other circuits, but that opinion was vacated. *See Johnson v. K Mart Corp.*, 273 F.3d 1035, 1054 & n. 16 (11th Cir.), *reh'g en banc granted*, 273 F.3d 1035 (11th Cir.2001).

*Manufacturing Co. v. State*, 289 N.W.2d 396 (Minn.1979). Specifically, Kolton argues that in *Minnesota Mining*, we interpreted "discrimination" under the MHRA to prohibit an employer from providing inferior benefits to an employee if that decision is based on the type of disability.

In *Minnesota Mining*, we held that the exclusion of pregnancy-related absences from an otherwise comprehensive income maintenance plan is per se sex discrimination within the meaning of the MHRA. *Minn. Mining*, 289 N.W.2d at 397. In 1977, more than two years before we decided *Minnesota Mining*, the legislature amended the MHRA's sex discrimination provisions. *Minn. Mining*, 289 N.W.2d at 398. Before the amendments, the MHRA prohibited employment discrimination on the basis of sex, but did not specifically mention pregnancy and childbirth. *Minn. Mining*, 289 N.W.2d at 398. The amendments defined "sex" to include pregnancy, childbirth, and related disabilities, and made it an unfair employment practice for an employer to treat women affected by pregnancy, childbirth, or related disabilities differently from other employees not so affected but who are similar in their ability or inability to work. Act of June 2, 1977, ch. 408, §§ 1, 3, 1977 Minn. Laws 951, 952–54. We stated that the employer's plan "obviously" violated the MHRA as amended in 1977. *Minn. Mining*, 289 N.W.2d at 398. We held that the amendments clarified rather than changed the scope of prohibited sex discrimination under the MHRA. *Minn. Mining*, 289 N.W.2d at 399–400. Thus the employer's plan violated the MHRA both before and after the amendments. *Minn. Mining*, 289 N.W.2d at 397.

Having interpreted the statute before and after the 1977 amendments, we noted that the employer's income maintenance plan covered voluntary cosmetic surgery and injuries resulting from voluntary participation in sports, but did not cover unforeseen and involuntary complications of pregnancy. *Id.* at 400. We then stated:

It seems clear that 3M's plan reflects traditional sexual role stereotypes. Women in their childbearing years are viewed merely as temporary members of the labor force who, as such, do not need income security, since they are most probably supplementing their husbands' incomes and will eventually quit their jobs to become mothers. Since insuring for pregnancy disabilities increases the cost of the plan, pregnancy coverage is simply deleted. If women are to be treated equally, such plans must be designed to insure identical security for women and for men from medical disabilities which may interrupt their income flow. Since only women face the risk of becoming pregnant, excluding only pregnancy-related disabilities from an otherwise comprehensive income maintenance plan is per se sex discrimination. A woman should be no more burdened than a man if she chooses to combine the roles of parent and employee, simply because the woman must bear the child.

*Id.*

In *Minnesota Mining*, we did not hold that coverage of some disabilities and not others *alone* violated the MHRA. Instead it was the direct correlation between the type of disability not covered and gender that invalidated the employer's plan. *Minn. Mining*, 289 N.W.2d at 400. Our interpretation in *Minnesota Mining* relied on the statutory amendment that clarified that the scope of sex discrimination included disabilities related to pregnancy and childbirth. In this case, we are without legislative guidance as to the scope of disability discrimination. Taken to its logical conclusion, Kolton's argument would re-

quire employers to cover every conceivable disabling malady equally, a requirement not at all apparent from the MHRA.

Another reason cited by several federal appellate court opinions, upon which appellants rely, to interpret Title I of the ADA to not require employers to provide the same coverage for different disabilities is the insurance industry's longstanding practice of offering different benefits for different disabilities and the absence of an explicit legislative condemnation of the practice. The Second Circuit, for example, reasoned as follows:

> [W]e are persuaded, when reading the language of the statute in light of the long-term history of disability plans, that Title I of the ADA does not require disability benefit plans to provide equal benefits for mental and physical disabilities. The ADA, unclear on its face, does not specifically condemn the historic and nearly universal practice inherent in the insurance industry of providing different benefits for different disabilities. The interpretation of Title I urged upon us * * * would require far-reaching changes in the way the insurance industry does business. Of course Congress could require those modifications to be made, but we are reluctant to infer such a mandate for radical change absent a clearer legislative command.

*Staten Island Sav. Bank*, 207 F.3d at 149 (citation omitted); *see Weyer*, 198 F.3d at 1116 ("[H]ad Congress intended to control which coverages had to be offered by employers, it would have spoken more plainly because of the well-established marketing process to the contrary. 'Insurers have historically and consistently made distinctions between mental and physical illness in offering health and disability coverage.' ") (quoting *Rogers v. Dep't of Health & Envtl. Control,* 174 F.3d 431, 435 (4th Cir.1999)); *cf. Ford,* 145 F.3d at 608 ("The ADA does not require equal coverage for every type of disability; such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA.").

Because the language of 42 U.S.C. § 12112(a) is similar to that of Minn.Stat. § 363.03, subd. 1(2)(c), we find the federal appellate courts' interpretations of Title I of the ADA useful to guide our interpretation of the MHRA. In this case, Anoka County provided LTD coverage to its employees, without regard to their physical or mental status, at no cost to them. All employees received the same plan on the same terms. The plan contained a limitation that was standard within the insurance industry. Just as Congress could have required "those modifications to be made," *Staten Island Sav. Bank,* 207 F.3d at 149, the Minnesota legislature could have explicitly mandated mental health parity in LTD plans had it intended to upset an established industry practice.[4] We hold that the county did not violate

---

4. Although the legislature mandated mental health parity in health plans, it exempted disability plans from that requirement. Minnesota Statutes § 62Q.47(b) (2000) provides that "[c]ost-sharing requirements and benefit or service limitations for outpatient mental health and outpatient chemical dependency services * * * must not place a greater financial burden on the insured or enrollee, or be more restrictive than those requirements and limitations for outpatient medical services." Minnesota Statutes § 62Q.47(c) (2000) impos-es the same conditions on inpatient services. Minnesota Statutes § 62Q.47(a) (2000) states that section 62Q.47 applies to health plans, as defined in Minn.Stat. § 62Q.01 (2000), that provide coverage for mental health or chemical dependency services. Section 62Q.01 refers to the definition of "health plan" in Minn. Stat. § 62A.011 (2000). Minnesota Statutes § 62A.011, subd. 3 (2000), excludes coverage that is "limited to disability or income protection coverage" from the definition of "health plan."

Minn.Stat. § 363.03, subd. 1(2)(c), by providing at no cost to its employees LTD coverage that provided different benefits for mental and physical disabilities. We therefore reverse the court of appeals and reinstate summary judgment on this claim in favor of appellants.

### Constitutional Claims

■ We turn to Kolton's claim that Anoka County violated her right to equal protection under the Minnesota and United States Constitutions. The Fourteenth Amendment provides in relevant part that "[no state shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Minnesota Constitution states that "[n]o member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art. I, § 2. "Both clauses have been analyzed under the same principles and begin with the mandate that all similarly situated individuals shall be treated alike, but only 'invidious discrimination' is deemed constitutionally offensive." *Scott v. Minneapolis Police Relief Ass'n,* 615 N.W.2d 66, 74 (Minn.2000).

■ If a constitutional challenge involves neither a suspect classification nor a fundamental right, we review the challenge under a rational basis standard under both the state and federal constitutions. *Id.* The parties do not dispute that rational basis review applies in this case. *See Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational."). Thus, the county's LTD plan is presumed valid and will be sustained if the classification drawn by it is rationally related to a legitimate governmental interest. *See Scott,* 615 N.W.2d at 74.

Over the years we have applied two formulations of a rational basis test to determine whether a challenged classification is rationally related to a legitimate governmental purpose. One formulation is the standard articulated by federal courts for the Equal Protection Clause of the Fourteenth Amendment, where it must be determined whether the challenged classification has a legitimate purpose and whether it was reasonable to believe that use of the challenged classification would promote that purpose. *See W. & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); *Imlay v. City of Lake Crystal,* 453 N.W.2d 326, 329 (Minn.1990). The second formulation, sometimes referred to as the Minnesota rational basis test, requires that:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*State v. Russell,* 477 N.W.2d 886, 888 (Minn.1991) (quoting *Wegan v. Village of Lexington,* 309 N.W.2d 273, 280 (Minn.

1981)).[5]

Resolution of Kolton's constitutional claims does not depend on which formulation of the rational basis test applies. Under either formulation, the district court properly granted appellants' motion for summary judgment. We conclude that the purpose of Anoka County's LTD plan—to provide the same plan to its employees while maintaining its fiscal integrity—is one that the county could legitimately attempt to achieve. *See Ohio Bureau of Employment Servs. v. Hodory,* 431 U.S. 471, 493, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Lienhard v. State,* 431 N.W.2d 861, 867 (Minn.1988). The distinctions drawn by the plan are relevant to its purpose as demonstrated by the fact that the county paid an additional $28,000 in annual premiums to remove the limitation on benefits for disabilities due to mental illness. A study attached to an affidavit submitted by an expert retained by Kolton recognized that the percentage of claims arising from mental and nervous disorders is markedly higher for LTD policies that do not limit the duration of benefits for such disabilities. In addition, the distinctions drawn by the plan in this case do not exclude classes of employees; all employees receive the same plan on the same terms. Thus, the county's LTD plan is rationally related to a legitimate governmental purpose.

We also acknowledge that the United States Supreme Court has spoken on the constitutionality of a provision in a disability plan that is similar to the provision Kolton challenges. In *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Court considered a constitutional challenge to a state disability insurance program that, in defining "disability," excluded from coverage certain disabilities resulting from pregnancy. *Id.* at 486, 94 S.Ct. 2485. The specific issue before the Court was whether the program invidiously discriminated against the plaintiff by not paying insurance benefits for disability that accompanies normal pregnancy and childbirth. *Id.* at 492, 94 S.Ct. 2485. The Court rejected the plaintiff's argument:

> We cannot agree that the exclusion of this disability from coverage amounts to invidious discrimination under the Equal Protection Clause. [The State] does not discriminate with respect to the persons or groups which are eligible for disability insurance protection under the program. The classification challenged in this case relates to the asserted underinclusiveness of the set of risks that the State has selected to insure. Although [the State] has created a program to insure most risks of employment disability, it has not chosen to insure all such risks, and this decision is reflected in the level of annual contributions exacted from participating employees. This Court has held that, consistently with the Equal Protection Clause, a State "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting the others...." Particularly with respect to social welfare programs, so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."

*Geduldig,* 417 U.S. at 494–95, 94 S.Ct. 2485 (citations omitted). The Court stated that

---

**5.** We acknowledge that questions exist as to the applicability of the two formulations in different contexts. *See Scott,* 615 N.W.2d at 74 n. 15.

the United States Constitution does not require a state "to subordinate or compromise its legitimate interests solely to create a more comprehensive social insurance program than it already has." *Geduldig,* 417 U.S. at 496, 94 S.Ct. 2485. The State's interests included maintaining the self-supporting nature of the program, distributing adequate benefits for disabilities that are covered rather than covering more disabilities inadequately, and maintaining the employee contribution rate at a level that does not unduly burden employees. *Id.* The Court ultimately held that the plaintiff's claim "is not a valid one under the Equal Protection Clause of the Fourteenth Amendment." *Geduldig,* 417 U.S. at 497, 94 S.Ct. 2485.

Less than 3 years later, the Court held that a disability program similar to the one at issue in *Geduldig* did not violate Title VII of the Civil Rights Act of 1964. *General Electric Co. v. Gilbert,* 429 U.S. 125, 128, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Congress then amended Title VII to reverse *Gilbert. Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 670, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). *Newport News* does not, however, cast doubt on the continued vitality of *Geduldig,* an interpretation not of Title VII but of the federal constitution. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 272 n. 3, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

We hold that Anoka County violated neither the Equal Protection Clause of the Fourteenth Amendment nor the right to equal protection of the Minnesota Constitution. We therefore affirm summary judgment in favor of appellants on Kolton's constitutional claims.

Affirmed in part, reversed in part.